(No. 14479.—Reversed and remanded.)

THE MADISON COAL CORPORATION, Appellant, *vs.* THE PITTSBURGH COAL COMPANY, Appellee.

*Opinion filed October 21, 1922—Rehearing denied Dec. 7, 1922.*

1. CONTRACTS—*what is not a proper credit in favor of vendor in action for breach of contract.* In an action by a vendee against the vendor for breach of a contract for the purchase of a coal mine the vendor is not entitled to credit for the expense of caring for and maintaining certain river equipment which it had used in transporting coal to its customers but which was expressly excluded by the contract from the property purchased.

2. SAME—*when word "entire" has no particular significance.* The use of the word "entire," in describing the property of a coal mine in a contract of sale, will not be construed as thereby including certain boats, barges and docks which the contract expressly excludes from the property purchased and which the evidence shows was understood by both parties not to be included.

APPEAL from the First Branch Appellate Court for the First District;—heard in that court on appeal from the Municipal Court of Chicago; the Hon. WELLS M. COOK, Judge, presiding.

KELLY, FRIEDMAN, SCHWARTZ & DOYLE, (ULYSSES S. SCHWARTZ, and HERBERT A. FRIEDLICH, of counsel,) for appellant.

JOHN J. SHERLOCK, (C. B. CHAPMAN, of counsel,) for appellee.

305—7

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Appellant, the Madison Coal Corporation, instituted suit in the municipal court of Chicago against appellee, the Pittsburgh Coal Company, to recover $3822.41 for breach of a written contract. Appellee admitted in its affidavit of merits the execution of the contract set out in the statement of claim by appellant but denied any breach thereof. A trial was had before the court without a jury. The court found the issues in favor of the appellee and rendered judgment against the appellant for costs. On appeal to the Appellate Court for the First District the judgment of the municipal court was affirmed. A certificate of importance and an appeal were allowed by the Appellate Court to this court.

Appellant is a subsidiary of the Illinois Central Railroad Company and is engaged in the mining of coal for that railroad company. At the time the agreement on which this suit is brought was entered into, appellee was the owner of coal mining property at DeKoven, Kentucky, on the Ohio river. This property had formerly been owned by the Ohio Valley Coal Mining Company, whose name is used in the contract as the party of the first part, but appellee owned all of the stock in that company, and there is no question made as to its being bound by the contract. The mine was located on the river, and coal could be shipped, and for many years had been shipped, from that mine either by rail or water, and for that reason the mine is known as a rail-and-river mine. Appellee owned other mines along the Ohio river of the same character. For use in shipping coal from this mine and other mines along the river, appellee maintained a number of river craft, consisting of barges, tow-boats, harbor-boats, pump-boats and docks. At the De-Koven mine appellee maintained a harbor-boat, pump-boat, tipple for loading coal into barges, and a dock. Appellant being desirous of purchasing this mine and equipment, exclusive of river craft and equipment, entered into negotia-

tions, through its agent, A. J. Moorshead, with S. C. Gailey, the representative of appellee. These two parties negotiated the sale of the mine, worked out the details and agreed on the "tentative agreement" upon which this suit is brought and signed it on behalf of their respective companies, and it is in the following words and figures:

"Tentative Agreement Between the Ohio Valley Coal Mining Company and the Madison Coal Corporation, Covering the Sale of the Mining Property at DeKoven, Kentucky.

1. "Purchase price of the property shall be $225,000, plus value of merchandise in company store.

2. "The above named price, $225,000, shall include all mine buildings, all dwellings, all machinery, all mine supplies on hand, as well as the surface and mineral rights contained in and connected with the property of the Ohio Valley Coal Mining Company at DeKoven, Kentucky, (with the following exceptions only.) The store merchandise shall be paid for (in addition to the above named price) on the results of an inventory taken by representatives of each company. There shall also be excluded from the purchase price all river and railroad equipment, (which is to be removed by the vendor,) but the river railroad track as now existing is not to be removed and is to be included in the purchase price.

3. "The river equipment to be removed is as follows: Boat loader, incline, drum, boat mover, five-ton cars used on said railroad for transportation of coal, steam locomotive, pump-boat, and any other equipment used on the river railroad for loading barges.

4. "Sale of property to be contingent upon the results of the examination of titles and of the land, as described in blue-print furnished to the buyer by the seller, dated July 28, 1908, and which contains the following figures:

Total area........................................3298 acres
Total area of coal (No. 9 seam).......................2930      "
Area of mine workings............................. 570      "
Total acreage of coal remaining Jan. 1, 1917...........2360      "
Total surface area remaining as of Jan. 1, 1917......... 250      "

5. "It is further agreed that when the sale upon price and conditions herein given is approved by the boards of directors of both companies and the stockholders of the vendor, until which this agreement shall not be binding, the vendor shall continue operating the property, loading and delivering all of its coal to the vendee, commencing with the 16th day of September, 1917, pending the examination of land and titles and until a finding has been made thereon, and the vendee shall pay for all coal so mined and delivered at the rate of one dollar and fifty cents ($1.50) per ton, not

later than the 20th day of each month, for all coal furnished the preceding month.

6. "In case titles are found to be good the property shall pass into the possession of the Madison Coal Corporation at the close of the next pay-roll period thereafter, and thereupon the vendor shall make an accounting to the purchaser covering the operations of the entire property, commencing with September 16, 1917, and up to the date the purchaser takes charge of the property, and shall pay the vendee the net earnings of the entire property, and which will include earnings derived from the sale of coal, sale of merchandise, rentals of every character and income from all sources.

7. "Payment shall be made within thirty (30) days after the vendee takes charge of the property.

8. "The titles to the land to be conveyed shall be good and marketable fee simple titles, and the titles to all the coal and coal mining privileges shall be good and marketable. The property shall be free from all liens and encumbrances. If, upon examination thereof, the title of the vendor in and to a portion of the above described property shall be found to be good and marketable and free from encumbrances and the title to a portion of said property shall be found to be defective or encumbered, but such property the title to which is so found to be defective or encumbered, or any part thereof, shall not, in the judgment of the vendee, be necessary to the successful operation of the property for mining purposes, the Madison Company shall purchase the part of said property the title to which shall have been found to be good and marketable, and the purchase price herein provided for shall in such event be reduced at the rate of fifty ($50) dollars per acre for the portion of said property which may not be purchased. The judgment of the vendee shall be conclusive of the question of the necessity of the property for mining purposes."

The tentative agreement was approved and ratified by appellant after examination of the title to the property, and it took title December 1, 1917. After the execution of the tentative agreement, and prior to the time appellant took over the mine, appellee operated the mine and delivered to appellant all the coal mined with the exception of 900 tons, which appellant, at appellee's urgent request, allowed the latter to retain and use and sell for its river trade, and for which the latter in its accounting credited appellant at the rate of $1.50 per ton, but did not allow any credit for appellee's profit on the coal or for the use of the river equipment in transporting the 900 tons so released by appellant.

The only actual use made of the river equipment during the operation of the mine from September 16, 1917, to December 1, 1917, (the period of operation pending final approval and ratification of the contract,) was in loading and transporting the 900 tons released to appellee, so far as this record discloses. It is appellee's contention that it preserved the river equipment and kept it in condition for operation in connection with the mine, so that in case appellant did not finally purchase the property the river equipment might be in the same condition for appellee's use as it was when the tentative agreement was executed.

In its accounting to the appellant under paragraph 6 of the contract appellee deducted the following items as part of its expense in operating the mine: "Labor, fuel and supplies and insurance on steamboat, $1602.05; labor, fuel and supplies of pump-boat and care of river craft, $2006.40." The appellant objected to said two items, amounting to $3608.45, and insisted that under the terms of the contract appellee had no right to such credit, as the tentative contract did not provide for or contemplate the operation of any of the river craft, or maintenance of the same, at appellant's expense during the period of time the mine was operated pending the final approval and confirmation of the contract. It is for said amount, plus interest thereon at the rate of five per cent from February 4, 1918, to the date of the commencement of this suit, that appellant instituted the suit.

The decision of this case rests entirely upon the construction of the words "entire property," as used in the sixth paragraph of the tentative agreement. Appellee contends that by the use of said words the contract is ambiguous, and that under the evidence introduced in the record the words "entire property" mean all of the property of the mine, including the river equipment, and that it is entitled to the credits aforesaid for the maintenance of the river equipment. Appellant, on the other hand, contends that the word "entire," in said paragraph, is used only to

emphasize the word "property," and does not, as used in the contract, extend the meaning of the word "property" so as to include the river equipment, which was expressly excluded by the terms of the agreement. Appellant also contends that under the oral evidence introduced it is further made manifest that the parties did not by the use of the words "entire property" intend to include the river equipment, or the use thereof, in the operation of the mine.

Oral evidence was introduced for the purpose of enabling the court to view the contract from the situation of the parties at the time they executed the contract and to understand the condition of the property and its constituent parts at such time, which evidence is, in substance, the following: Moorshead was the president and general manager of appellant and had been for twelve years. Appellant produces coal for the Illinois Central Railroad Company. Gailey was assistant to the president of appellee. These two parties, for their respective companies, handled the sale and purchase of the mine property from the beginning of the negotiations to the signing of the tentative agreement, and, after they had thoroughly considered all matters, Moorshead, in the presence of Gailey, dictated the tentative agreement and they both then signed it. Appellee for years had operated the mine property as a rail-and-river mine up to the signing of the contract. When the water in the Ohio was sufficiently high to enable appellee to mine and ship by river it used the river craft and equipment in the loading and shipping of coal for sale. When the river was too low for that purpose the river craft and equipment were not used and the loading and shipping were accomplished by the use of the railroad. The only railroad that ran by and connected with this mine was the Illinois Central railroad, for the use of which appellant was buying this mine, the coal being intended for the use of that railroad company's engines. Gailey knew this, and he testified that the entire output of the mine was sold to the Illi-

nois Central Railroad Company, by virtue of the tentative agreement, at $1.50 per ton, and that he knew appellant was disposing the entire output of the mine to said railroad company; that he knew that appellant would take the coal that was mined under the tentative agreement by rail, only; that he therefore let off the men at the river landing and only used them when they were dumping coal; that the only dumping at the landing after the contract was signed was during a period of two days in which appellee was loading the 900 tons for shipment by appellant's special permission. The record further shows that appellant, as a business proposition, could not receive coal by water.

The word "property" is used about fifteen or sixteen times in the draft of the tentative agreement or contract. The words "entire property" are used twice and only in the sixth paragraph, and the word "property" is twice used in that paragraph without the modifying word "entire." If it be conceded that the contract is ambiguous for the reason aforesaid, under the evidence in the record, and after carefully considering the entire contract as written, our conclusion is that the contract is not susceptible of the interpretation placed upon it by appellee. The oral evidence really makes it clear that such interpretation cannot be given to the contract. Gailey and Moorshead were the real parties who made this written agreement. It was thoroughly understood by both of them that the coal mined pending the final confirmation of the contract was to be taken by the Illinois Central Railroad Company at $1.50 per ton and that appellant would take the coal mined during that period by rail, only. It was therefore positively understood by the parties that the use of the river equipment would not be necessary and would not be used in the delivery of this coal. For that reason the river-men were discharged during that period so far as that job was concerned, and would not have been employed at all but for the fact that after continuous begging appellant was induced to allow appellee to have

900 tons of coal for shipment on its own account and to its customers on the river whom it was under obligations to supply. For that coal it paid the same that the Illinois Central Railroad Company paid for it. There was never at any time any agreement, either in the written contract or by any oral contract, by which appellee was bound to hold its river equipment ready for the use of appellant in case coal could not be delivered by rail. There is not an intimation in this record that would indicate that there was any possibility that coal could not, and would not for any part of such period, be delivered to appellant by rail, and the situation and the understanding of the parties were such that appellee well understood that there would be no use of the river equipment in delivering any coal mined during that period, until the 900 tons were released to it.

Appellee's argument to the effect that it was bound to keep its river equipment at its mine and maintain it and keep it ready for appellant's use to ship coal by river has no foundation in fact, as appellee absolutely knew that all coal would be delivered to appellant by rail. Also the argument of appellee that it would be a great injustice not to allow it credit for the expense of maintaining the river equipment *in statu quo* and for the use of the mine pending the final approval of the contract is without any foundation whatever, and asking for such credit appears to be an afterthought of appellee. Allowing such credit, it appears to us, would be an injustice to appellant.

It is apparent, we think, in view of the evidence in this case explaining the situation and object and purpose in making this contract, that the word "property" all through the contract has the same meaning, whether it be preceded by the word "entire" or not. The parties themselves so construed the contract while operating this coal mine pending final consummation of the purchase and sale thereof. During that entire time appellant received coal by rail only, and never asked or at any time intimated that it would receive

coal otherwise or could do so. Appellee never at any time prepared its equipment to load and ship by water for appellant, and it discharged its river-men because of the fact that it knew it would not need them. The contract expressly provides that all river and railroad equipment was to be excluded from the purchase price, and that such railroad equipment was to be removed by the vendor, except the river railroad track, and the equipment to be removed is specifically itemized in the contract. The words "entire property" were evidently used in the sixth paragraph of the contract because of the fact that the entire purchase by appellant was not only of appellee's mine, mine buildings, machinery and supplies on hand, but it also included dwelling houses and the merchandise in the company store, and also 250 acres of surface area. The accounting by appellee to appellant was to be for all net earnings from all of those various sources, and to entirely cover that idea the contract specifically provided for an accounting of the net earnings of the "entire property," and it was further particularly specified in the sixth paragraph that such earnings would include earnings derived from the sale of coal, sale of merchandise, rentals of every character and income from all sources. No mention is made of steamboats or other river equipment in this connection. Had the parties intended by the use of the words "entire property" to cover the river equipment, including the steamboat, appellant would have been entitled to the net earnings of such equipment, but it never claimed such earnings and appellee never so interpreted the contract by its action.

In our interpretation of the meaning of the contract we attach no special importance to the fact that it was a tentative contract, and particularly as to the meaning of the words "entire property," as used in the sixth paragraph. Neither do we attach any special importance to the fact that Moorshead drew the contract or dictated it. Under the showing in the record, the contract, in our view of it, is

only susceptible of the interpretation we have placed upon
it. All the facts are admitted or not disputed by the par-
ties, and under such facts appellant was entitled to a judg-
ment in the lower court for $3608.45, the amount claimed,
with interest to the date of the judgment.

The judgment of the Appellate Court is reversed and
the cause is remanded to the municipal court, with direc-
tions to that court to enter judgment in the above sum in
favor of appellant and against appellee, and for costs.

*Reversed and remanded, with directions.*